*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0475p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-2319

SADEQ NAJI AHMED,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-80629—Bernard A. Friedman, Chief District Judge.

Argued: November 28, 2006

Decided and Filed:  December 29, 2006

Before:  BOGGS, Chief Judge; COOK, Circuit Judge; and CARR, Chief District Judge.[*]

_____

### COUNSEL

**ARGUED:** Richard M. Lustig, RICHARD M. LUSTIG LAW OFFICE, Birmingham, Michigan, for Appellant.  Cathleen M. Corken, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Richard M. Lustig, RICHARD M. LUSTIG LAW OFFICE, Birmingham, Michigan, for Appellant. Cathleen M. Corken, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

BOGGS, Chief Judge.  Sadeq Ahmed was indicted on two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2), based on written answers he gave about his employment history as part of his background investigation for a baggage screener position with the Transportation Security Administration (TSA).  After a jury trial resulted in guilty verdicts on both counts, the district court sentenced him to 18 months of imprisonment.  Ahmed now appeals his conviction, alleging insufficiency of the indictment and evidentiary errors; and his sentence, alleging

---

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

that the district court's imposition of a sentence above the guidelines range was unreasonable. We affirm.

I

In December 1997, Sadeq Ahmed enlisted in the United States Air Force, and was stationed at Elgin Air Force Base in Florida, where he was assigned to the Operations Support Squadron of the 33rd Fighter Wing. His responsibilities included analyzing performance and capability information relating to F-15 fighters and pilots, and required security clearance.

In March 2001, Ahmed authored and circulated a document defending Usama bin Laden as a victim of religious persecution, and accusing the United States of acts of terrorism, for, among other things, the use of atomic weapons at Hiroshima and Nagasaki, bombing of Iraqi civilians, imposing sanctions on Iraq, and supporting the "terrorist state" of Israel. He further indicated, in statements to other servicemen, that he believed all aircraft flying over Iraq should crash, a statement understood to apply to the United States aircraft then enforcing no-fly zone restrictions. In a discussion of his document and statements with his supervisor, Ahmed indicated that, if the United States went to war with Iraq, he would have to fight on the Iraqi side. On other occasions, he verbally contemplated the possibility of fighting against, and killing, United States soldiers should the United States become involved in a conflict that violated his religious beliefs, and that he would like the opportunity to fight in the noble cause of his hero, bin Laden.

As the events of September 11, 2001, unfolded, Ahmed, watching the destruction on television in the company of his colleagues, remarked that the attacks were a "beautiful sight," and later commented that the United States deserved the attacks because of its support for Israel, and that he was very happy about what had happened. By this time, the Operations Support Squadron commander, Col. Steven Seroka, had been aware for several months that Ahmed's statements were causing concern to his superiors. After being informed of Ahmed's comments on September 11, Seroka asked Ahmed's superiors to speak with him to determine his loyalties. His superiors met with Ahmed to discuss the matter on September 13, and reported back to Seroka that Ahmed had specified his loyalty to his family and religion, but had not included the United States or its military among his loyalties, and had stated that he was neither for or against the September 11 attacks.

On September 17, 2001, Ahmed was ordered to "report in," a formal meeting with his full chain of command that is governed by an established protocol. At the meeting, Seroka informed Ahmed that he was suspending his access to classified information, and prohibited him from entering the area of the 33rd Fighter Wing. Seroka read Ahmed a "Notification of Suspension of Access," which indicated that a determination had been made to suspend his access to classified information and unescorted entry into restricted areas. Ahmed signed and retained a copy of this notification. Ahmed also signed a "Security Termination Statement," which indicated his "termination of access to all classified information," and a document entitled "Restriction from 33 Fighter Wing." Ahmed was relieved of his duties with the Operational Support Squadron, and assigned to another squadron in another part of the base, which involved no access to classified information. He was escorted from the meeting to his former worksite to gather his personal belongings, and escorted to his new station. At the time of the reporting in, Ahmed had been scheduled for discharge on December 2, 2001.

After the meeting, Seroka was concerned that stop loss would be implemented before that date, thus potentially deferring Ahmed's discharge, and asked Ahmed's new chain of command to discuss an earlier discharge date with him. Seroka subsequently approved an advancement of Ahmed's discharge date to September 28, 2001. Subsequent to his discharge on that date, Ahmed was mailed his final performance evaluation, and returned a mailed acknowledgment of receipt. In this evaluation, Ahmed's immediate supervisor, Sgt. Sharpe, rated Ahmed positively on a number

of points relating to his duties, but categorized his "conduct on/off duty" as "unacceptable," and did not recommend his promotion "at this time." The report also included extensive comments from Seroka, indicating that the ratings did not "fully capture or document the magnitude of SrA Ahmed's disloyal, near seditionist behavior," providing considerable detail regarding Ahmed's history in this regard, and recommending a more critical evaluation in specific categories. Seroka testified at trial that, on advice of military lawyers, he did not seek a dishonorable discharge.

After his discharge, Ahmed worked for a private company providing baggage and passenger screening services at Detroit Metropolitan Airport. In October 2002, the TSA took over screening functions, and Ahmed was transferred to TSA, conditional on his completion of a security background investigation. As part of that investigation, Ahmed completed a "Questionnaire for Public Trust Positions," developed by the Office of Personnel Management. Section 12 of the form asked whether the applicant had, within the last seven years, been

> 1- Fired from job; 2- Quit a job after being told you'd be fired; 3- Left a job by mutual agreement following allegations of misconduct; 4-Left a job by mutual agreement following allegations of unsatisfactory performance; 5- Left a job for others [*sic*] reasons under unfavorable circumstances

Ahmed checked "no". Section 18b of the form asked:

> To your knowledge, have you ever had a clearance or access authorization denied, suspended, or revoked, or have you ever been debarred from government employment? If "yes," give date of action and agency. note: An administrative downgrade or termination of security clearance is not a revocation.

Ahmed checked "no."

On July 21, 2004, Ahmed was indicted on two counts of making false statements, in violation of 18 U.S.C. § 1001(a)(2), based on these responses. On May 19, 2005, the jury returned a guilty verdict on both counts. The district court calculated a guidelines range of zero to six months of imprisonment, and imposed a sentence of 18 months. Ahmed filed a timely notice of appeal.

II

Ahmed argues that his indictment failed to allege an offense under 18 U.S.C. § 1001 because his answers to the questions were literally true or, alternatively, that the vagueness of the questions precludes a finding his responses constituted false statements.[1] Ahmed raised an objection to count 1 of the indictment, relating to his answer in Section 12, in his motion to dismiss, but raises his objection to count 2, relating to his answer in Section 18, for the first time on appeal. We review the sufficiency of an indictment *de novo*, but as to the second count, because it was unchallenged below, we construe the indictment "liberally in favor of its sufficiency." *United States v. Perry*, 438 F.3d 642, 651 (6th Cir. 2006).

Ahmed's argument rests on the contention that, because he was honorably discharged, his denial of "unfavorable circumstances" surrounding his departure from the Air Force was literally true; and that because his security clearance had not been revoked (an action outside of Col. Seroka's authority), his answer to the second question was literally true in light of its instruction that an "administrative downgrade or termination . . . is not a revocation." Ahmed is correct as a legal

---

[1] Ahmed briefly mentions the argument he made below in his motion to dismiss, that Count 1 of the indictment "was void for vagueness and overbredth [*sic*] and, therefore unconstitutional," but does not appear to renew that argument on appeal. We thus consider it abandoned. *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).

matter that a § 1001 indictment "premised on a statement which on its face is not false" is fatally defective, insofar as a false statement is an element of the crime. *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) (quoting *United States v. Gahagan*, 881 F.2d 1380, 1383 (6th Cir. 1989)).

However, Ahmed has in no way demonstrated that his statements were facially true. His contention amounts only to an assertion that under *some* conceivable interpretation of the questions, his answers would not have been false. He argues, in effect, that because "unfavorable circumstances" could be construed to exclude an honorable discharge, and because the restrictions placed on his classified access after his reporting in could be construed to be an "administrative downgrade or termination," his answers are literally true. Our cases have not directly addressed this type of contention in a § 1001 context, but as a matter of logic, this is a far cry from a demonstration of facial truth. As other courts have observed in the analogous context of perjury prosecutions, the possibility that a defendant "can postulate unstated premises of the question that would make his answer literally true" does not bar the possibility of liability. *United States v. Cuesta*, 597 F.2d 903, 920 (5th Cir. 1979); *see also United States v. Kehoe*, 562 F.2d 65, 68 (1st Cir. 1978) ("We do not believe that the possibility that the defendant understood the questions to be limited to one particular incident raises an issue of literal truth."). Rather, his argument only raises a jury issue as to a reasonable interpretation of the question and his *actual* understanding.

The § 1001 cases Ahmed relies on to support his contention of facial truth are inapposite. In *Gatewood*, the defendant was charged with falsely certifying that he had made "payments" to subcontractors, when he had in fact made payments that covered only part of what was owed. In *Gahagan*, the defendant was charged with falsely denying ownership of a vehicle, when he had legally transferred title to the vehicle before making that representation (although apparently he still had effective control of the vehicle). In both cases, this court found the indictments to be defective, insofar as the statements in question were facially true: construing the responses in these cases as *false* would have required an unstated premise (in *Gatewood*, that "payments" meant "full payments," and in *Gahagan*, that "ownership" meant something other than legal title). This case presents precisely the opposite situation, where unstated premises are required to construe Ahmed's answers as *true*.[2]

Ahmed's alternative argument, that the vagueness of the questions renders it impossible to conclude that he answered them falsely, is similarly unavailing. Even if the interpretations of the questions Ahmed claims to have had in mind when he answered are plausible—i.e., even if the questions exhibited some conceivable degree of ambiguity—"a defendant's 'understanding of the question is for the jury to resolve in the first instance.'" *United States v. Damrah*, 412 F.3d 618, 626 (6th Cir. 2005) (citing *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998)). Indeed, a false statement charge under § 1001, like a perjury charge, effectively demands "an inquiry into the Defendant's state of mind and his intent to deceive at the time the testimony was given," and "the entire focus of a perjury inquiry centers upon what the testifier knew and when he knew it," in order to "establish[] beyond a reasonable doubt that he knew his testimony to be false when he gave it." *United States v. DeZarn*, 157 F.3d 1042, 1049 (6th Cir. 1998). Short of a question that is "fundamentally ambiguous"—one "without meaning 'about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer,'" *Damrah*, 412 F.3d at 626 (quoting *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987))—Ahmed's actual understanding of the questions is a matter for the jury. Although the questions at issue here may indeed be broad, there is no basis to conclude that they display the kind

---

[2] Ahmed also invokes *Bronston v. United States*, 409 U.S. 352 (1973), in support of his "literal truth" claim, but the literal truth defense articulated in *Bronston* specifically concerns *non-responsive* answers that are literally true, even if clearly intended to deceive. Ahmed, however, has given no reason to suggest that his answers here were similarly non-responsive—indeed, an answer of "no" hardly could be.

of fundamental ambiguity that would invalidate the indictment. *See id.* at 627 (noting the distinction between ambiguity and breadth).**3**

III

Ahmed further claims that he was denied his right to a fair trial as a result of two alleged evidentiary errors during his trial. Neither of these claims merits reversal.

A

At trial, Inga Tibbs, an Assistant Director in TSA's Personnel Security Division, testified for the prosecution about the agency's determination of Ahmed's employment suitability, and the role his answers to the Questionnaire played in that determination. As part of that testimony, she indicated that the information provided by the Office of Personnel Management suggested to the TSA that Ahmed had not been honest in his answer to Section 12 of the Questionnaire, and that this conclusion influenced their employment suitability determination. At trial, Ahmed objected to this line of questioning on the ground that it was more prejudicial than probative; on appeal, he argues instead that admission of this testimony was improper lay opinion under Fed. R. Evid. 701, and—apparently without noting the inherent contradiction—improper "ultimate issue" expert testimony under Fed. R. Evid. 704(b). Insofar as his argument on appeal is based on grounds not asserted at trial, we review for plain error. *United States v. Reed*, 167 F.3d 984, 989 (6th Cir. 1999).

Ahmed's Rule 704(b) argument is completely without merit: the rule by its terms applies to expert witness testimony, and Tibbs was not testifying as an expert witness.

Fed. R. Evid. 701 permits lay opinion testimony where it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The testimony here clearly meets these criteria. Tibbs was directly involved in the determination of Ahmed's suitability for continued employment, and testified based on her personal knowledge of the TSA's evaluation of Ahmed's answers, thus satisfying the first condition. *See United States v. Torres*, 758 F.2d 147, 149 (6th Cir. 1985) (the "foundational requirement of personal knowledge" is satisfied when the witness was "privy to the details" of the events in question). Tibbs's testimony was elicited to prove that Ahmed's answers were material to the agency's determination that he was unsuitable for employment—an element of a § 1001 offense, and one that was disputed at trial by the Ahmed, who argued that the TSA conducts its own investigation and would base its decision on that, rather than his answers—and thus clearly helpful to a determination of a fact in issue. *See United States v. Steele*, 933 F.2d 1313, 1319 (6th Cir. 1991) (a statement is material under § 1001 if it has a tendency to influence a function entrusted to a governmental agency). Finally, there is no sugestion that Tibbs' testimony was based on any kind of specialized knowledge.

---

**3**The distinction between non-responsiveness and faux ambiguity can be seen in an analogy to the *Bronston* case. When Bronston was asked whether he had ever had a Swiss bank account and he answered, "The company had an account there for about six months . . .," 409 U.S. at 354, the answer was non-responsive but, as the court held, not false. On the other hand, had Bronston answered "no" because he had in mind the possible ambiguity that a "Swiss" bank account would be one made out of chocolate, it would properly have been a question for the jury as to whether that alleged interpretation was either plausible, or actually in his mind, rather than a post hoc rationalization.

Here, in the same fashion, it is possible that a person could think that there is no circumstance other than a dishonorable discharge that would constitute "unfavorable circumstances," but similarly, whether that interpretation was reasonable or actually in the defendant's mind is a matter for the jury. The same applies to Ahmed's other answer, where it could be possible that, even after having been given a piece of paper that says "a security determination has been made to suspend your access to classified information," a person could believe that his access authorization had not been suspended, but that too is a matter for the jury. *See DeZarn*, 157 F.3d at 1049.

Ahmed correctly notes that this court disfavors lay opinion testimony when it consists of a legal conclusion, citing *Torres* for the proposition that "testimony containing a legal conclusion . . . conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury . . . invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." 758 F.2d at 150 (internal quotation marks and citations omitted). However, we also "accord a relatively wide degree of discretion in admitting or excluding testimony which arguably contains a legal conclusion . . . because it is often difficult to determine whether a legal conclusion is implicated in the testimony." *Ibid.* Tibbs's testimony that Ahmed answered falsely at most amounts to an extremely ambiguous case. Falsity is an element of a § 1001 offense, and in that respect her testimony implicates a legal conclusion. However, such an ambiguity is resolved by "determin[ing] whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular," *ibid.*, and there is no suggestion in the record that Tibbs's testimony was anything other than a non-technical expression of her informed opinion that Ahmed had given false answers on his Questionnaire, and that such opinion was material to the agency's determination of Ahmed's suitability for employment. No limiting instruction was sought as to the proper use of her testimony.

B

Ahmed also argues that the trial court erred in admitting Col. Seroka's testimony regarding his exercise of his right to remain silent during his September 17 "reporting in," in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). His argument misses the point of *Doyle*, which held that it was a due process violation to use post-arrest silence "to impeach an explanation subsequently offered at trial." *Id.* at 618. Ahmed's silence in 2001, by contrast, did not relate to the matter for which he was charged and tried—his answers on the questionnaire in 2002—rendering this case plainly outside the scope of *Doyle*.

Ahmed also contends that the trial court erred by not permitting cross-examination of Col. Seroka concerning the contents of a written statement Ahmed made after his reporting in (where he had been given 72 hours to respond in writing), and in not allowing the document itself to be introduced. On cross-examination, Seroka testified that Ahmed had submitted a response, but that it did not address the issues and concerns raised at the reporting in. At trial, Ahmed sought to overcome a hearsay objection to introducing the document and testimony concerning its contents on the grounds that he sought to impeach Seroka, by showing that the documents did indeed address his concerns. On appeal Ahmed suggests that the document was not hearsay, for reasons that are not clearly articulated, but which in any case cannot be correct. To the extent that Ahmed merely sought to prove that he had addressed the concerns raised at the reporting in, the contents of the letter itself add nothing to the testimony elicited from Col. Seroka on cross-examination, and introducing the contents could only have been useful as proof of the assertions made therein. Ahmed suggests no applicable exception to the general inadmissibility of hearsay, Fed. R. Evid. 802.

IV

Ahmed argues that the district court's imposition of an 18-month sentence, where the relevant guidelines range was a prison sentence of zero to six months, was unreasonable. He asserts that the district court failed to consider adequately the sentencing factors set out in 18 U.S.C. § 3553(a) by not considering his education, career in the Air Force, and expression of his First Amendment rights. A review of the record, however, indicates the contrary. The district court noted Ahmed's excellent service record prior to the incidents that led to his early discharge, considered the continuing education Ahmed was engaging in at the time (and indeed allowed Ahmed to report for his sentence after his graduation), and explicitly addressed Ahmed's allegation that the sentence and the charges were in retaliation for protected but unpopular speech or opinions. The trial court further explained in detail its belief that the guidelines range largely contemplated false statements

in the context of financial or other similar fraud rather than in a public safety or national security context, and that a false statement in the latter context was considerably more serious, warranting greater punishment based on gravity and the need for deterrence. Given that the trial court in fact addressed the § 3553(a) factors that Ahmed considered relevant, and that there is no indication that it failed to consider any other relevant factors, we consider the sentence to be procedurally reasonable. *See United States v. McBride*,434 F.3d 470, 475-76 & n.3 (6th Cir. 2006).

Ahmed does not develop an argument that his sentence was substantively unreasonable, beyond his request that this court direct the trial court to "resentence him in accordance with the Guidelines," a request that clearly misapprehends the post-*Booker* role of the Sentencing Guidelines by implying that they remain mandatory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). Although we do not accord a presumption of substantive reasonableness to sentences outside the guidelines range (as we do for sentences within it), neither do we accord them a presumption of substantive unreasonableness. *United States v. Ferguson*, 456 F.3d 660, 664-65 (6th Cir. 2006). Beyond his (incorrect) allegation that the trial court failed to consider pertinent factors, and the assertion, addressed by the trial court, that his unpopular speech was impermissibly considered as a factor, Ahmed offers no reason to conclude that his sentence was substantively unreasonable. Indeed, the sentence was grounded in the trial court's clearly articulated, well-reasoned concerns about the seriousness of the crime and the need for deterrence, did not accord "an unreasonable amount of weight to any pertinent factor," and was not selected arbitrarily. *United States v. Webb*, 403 F.3d 373, 385 (2005).

V

For the foregoing reasons, we AFFIRM the district court's judgment.