# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3749

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| David Donald Turner, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 15, 2007
Filed: September 7, 2007

_____

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

David Turner was charged with one count of attempting to manufacture fifty grams or more of methamphetamine, and one count of knowingly making false material declarations, *i.e.*, perjury. Before trial, he moved to sever these two counts, but the district court[1] denied the motion. A jury convicted Turner on both counts. At sentencing, the court enhanced Turner's offense level under the advisory guidelines

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

based on a finding that his methamphetamine manufacturing had posed a substantial risk of harm to human life. Turner appeals his conviction and sentence. We affirm.

## I.

According to evidence presented by the prosecution, Turner manufactured methamphetamine at his home beginning no later than early 2004. Turner combined methamphetamine precursors – red phosphorus, pseudoephedrine, and iodine crystals, all of which he stored in his basement – and heated these chemicals using a hot plate on a table to the right of his basement stairs. He would later "gas" the methamphetamine liquid with hydrogen chloride to produce methamphetamine hydrochloride flakes, which he filtered out and dried.

Rex Breitbach testified that he had helped Turner produce methamphetamine in this basement laboratory three or four times by April 2004. He and Turner also smoked methamphetamine together at Turner's residence on several occasions. John Hoyne, who also had methamphetamine dealings with Turner, testified that Turner said he and Breitbach had a "partnership."

In May 2004, Breitbach was arrested on drug charges. Turner bailed Breitbach out of jail, but apparently had no further interactions with him. Turner continued to engage in drug transactions with other individuals. Hoyne testified that in 2005, he bought methamphetamine from Turner. Hoyne also brought Turner precursor chemicals in exchange for small amounts of methamphetamine and for assistance in producing his own methamphetamine. Jodie McAtee also described obtaining a bottle of lye in 2005 for Turner to use in manufacturing methamphetamine and seeing others assist Turner with his manufacturing.

In March 2005, Breitbach was tried for manufacturing or attempting to manufacture methamphetamine, among other counts. *See United States v. Breitbach*,

180 Fed. App'x 597 (8th Cir. 2006) (unpublished). Breitbach called Turner as a defense witness. Turner testified that he had no idea that Breitbach had used or manufactured methamphetamine. He denied having "any kind of drug dealing" with Breitbach. He also denied ever assisting Breitbach or having "any involvement with him in manufacturing methamphetamine." Breitbach was nonetheless convicted.

On July 23, 2005, a fire started in Turner's house. Neighbors saw Turner run out of the house without a shirt, blackened by soot and smelling of smoke. After stopping briefly, Turner continued running down the street. Turner's neighbors called 911, and police and firefighters arrived at Turner's home. Turner was eventually found by police, decontaminated, and detained.

While in Turner's house fighting the fire, a firefighter noticed various items consistent with the manufacture of methamphetamine and reported this discovery. All firefighters who entered the house had to be decontaminated after fighting the fire. One was treated at the hospital for heat-related injuries, and one firefighter's boots were damaged by the chemicals in Turner's home. Turner's dog was killed by the fire, and one of Turner's neighbors was treated at the scene for minor smoke inhalation. The fire department was unable to determine the cause of the fire, but concluded that it had begun near Turner's basement stairs in the vicinity of his methamphetamine-related items.

Soon after the fire, police executed a search warrant at Turner's home, where they found a wide variety of chemicals and equipment associated with the manufacture of methamphetamine. A grand jury eventually indicted Turner for attempting to manufacture fifty grams or more of methamphetamine on or about July 23, 2006, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The government later filed a superseding indictment, which also charged that Turner knowingly made a false material statement at Breitbach's trial, in violation of 18 U.S.C. § 1623.

Turner moved to sever these counts. A magistrate judge recommended that the motion be granted, on the ground that the manufacturing and perjury charges were separated in time and not part of a common scheme or plan. The district court declined to accept this recommendation, ruling instead that joinder was appropriate because the offenses were separated by only a few months, and because the evidence on the two counts overlapped.

The jury convicted Turner on both counts. The court ruled at sentencing that Turner's methamphetamine manufacturing had posed a substantial risk of harm to human life, and thus increased Turner's offense level by three levels under United States Sentencing Guidelines § 2D1.1(b)(6)(B) (since redesignated § 2D1.1(b)(8)(B)). After other adjustments, the court determined an offense level of 34 and a criminal history category of I, which resulted in a sentencing range of 151 to 188 months' imprisonment. The court sentenced Turner to 188 months' imprisonment on the attempt to manufacture count, and a concurrent term of 60 months' on the perjury count.

## II.

### A.

Turner argues that the district court should have granted his motion to sever the manufacturing and perjury counts. Even if two counts are improperly joined, however, we will reverse a court's denial of a motion to sever only if the misjoinder results in actual prejudice, *i.e.*, the misjoinder has a substantial and injurious effect or influence on the jury's verdict. *United States v. Lane*, 474 U.S. 438, 449 (1986); *see United States v. Little Dog*, 398 F.3d 1032, 1037 (8th Cir. 2005).

If evidence that a defendant committed one offense would be admissible to prove that he committed a second offense, then misjoinder of the first offense will not

be prejudicial with respect to a conviction on the second. *United States v. Rock*, 282 F.3d 548, 552 (8th Cir. 2002). Whether or not the counts in this case had been joined, the bulk of the evidence presented to prove that Turner made false statements at Breitbach's trial in April would have been admissible in a separate prosecution of Turner for manufacturing methamphetamine. The government proved the falsity of Turner's prior testimony by showing that he was involved in manufacturing methamphetamine in 2004. That Turner was involved in manufacturing in 2004 would have been admissible in a separate trial on the manufacturing charge to prove Turner's knowledge and intent in manufacturing methamphetamine during 2005. Fed. R. Evid. 404(b); *United States v. Beltz*, 385 F.3d 1158, 1162-63 (8th Cir. 2004), *cert. denied*, 544 U.S. 968 (2005).

The only evidence from a separate perjury case that might not have been admissible in a separate manufacturing case was the evidence of Turner's former testimony, in which he denied involvement with manufacturing in 2004. But we do not see how this evidence could have substantially influenced the jury's verdict on the 2005 manufacturing charge. Turner's denial, in and of itself, was not prejudicial. If the jury concluded that Turner's denial was false, then it did so based on evidence of his 2004 manufacturing that would have been admissible in a separate manufacturing trial. Once the jury was persuaded that Turner was involved in manufacturing in 2004, the fact that he also lied about it is unlikely to have affected the jury's decision about whether Turner was guilty of manufacturing in 2005.

Likewise, even assuming misjoinder, we conclude that evidence of Turner's manufacturing of methamphetamine in July 2005 did not substantially influence the verdict of guilty on the perjury charge. Breitbach's testimony that he and Turner had manufactured methamphetamine together in early 2004 was clearly admissible to show that Turner had testified falsely at Breitbach's trial. Evidence that Turner had engaged in additional manufacturing at a later date likely had little effect on the jury's assessment of Turner's guilt, as they already knew that he was a manufacturer of

methamphetamine. Any misjoinder is less likely to be prejudicial, moreover, when the jury is properly instructed to consider the joined counts separately, *United States v. Wadena*, 152 F.3d 831, 849 (8th Cir. 1998), and the district court so instructed the jury in this case. We thus conclude that the alleged misjoinder did not prejudice Turner.

B.

Turner next contends that the jury lacked sufficient evidence to convict him of perjury. When reviewing a challenge to the sufficiency of the evidence to support a conviction, "we will affirm if the record, viewed most favorably to the government, contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt." *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

Turner's perjury conviction was based on his answers to two questions during Breitbach's trial. The jury's verdict form addressed each question separately, and recorded that the jury found beyond a reasonable doubt that Turner's answer to each was willfully and intentionally false. Because one false statement is sufficient to support the one count of conviction, we need address only one question and answer. *See Kawakita v. United States*, 343 U.S. 717, 737 (1952); *United States v. Overholt*, 307 F.3d 1231, 1239 (10th Cir. 2002).

At Breitbach's trial, Turner was asked, "Did you ever assist Rex or did you ever have any involvement with him in manufacturing methamphetamine?" Turner answered "no." The jury in Turner's trial found beyond a reasonable doubt that Turner's response was willfully and intentionally false. Turner argues that the question was ambiguous, because it was compound, and because the meaning of "involvement" is unclear.

Generally, when a defendant is charged with answering falsely under oath, "the intended meaning of a question and answer are matters for a jury to decide." *United States v. Hirsch*, 360 F.3d 860, 863 (8th Cir. 2004) (internal quotation omitted). "[T]he existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution." *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003) (per curiam). If, however, a question is "fundamentally vague or ambiguous," then an answer to that question cannot sustain a perjury conviction. *Hirsch*, 360 F.3d at 863. A question is generally said to be "fundamentally ambiguous" if it does not have a meaning about which persons "of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer." *United States v. Ahmed*, 472 F.3d 427, 433 (6th Cir. 2006) (internal quotations omitted). The law subjects compound questions to the same standard, *United States v. Heater*, 63 F.3d 311, 327 (4th Cir. 1995), and we must determine, therefore, whether "the jury could conclude beyond a reasonable doubt that the defendant understood the question as did the government and that so understood, the defendant's answer was false." *United States v. McKenna*, 327 F.3d 830, 841 (9th Cir. 2003) (internal quotation omitted).

We first observe that whatever else "involvement in manufacturing methamphetamine" may encompass, it certainly includes working together with another person in a laboratory to produce methamphetamine. Therefore, there is no fundamental ambiguity in the word "involvement," and any denial by Turner that he had been so involved would support his perjury conviction.

Turner argues that his negative response to this question was nonetheless true, because he was answering the first portion of the question, which asked whether he assisted Breitbach in manufacturing methamphetamine. Turner says he truthfully denied assisting Breitbach, because Breitbach had assisted him, not the other way around. Even if we assume that Turner could say truthfully that he had not "assisted" Breitbach, this argument has no merit. Turner was not asked the compound question

in the conjunctive, *i.e.*, "Did you assist Breitbach *and* have any involvement with him in manufacturing methamphetamine?" He was asked if he had assisted Breitbach *or* had any involvement with him in methamphetamine manufacturing – unambiguously precluding a denial if he had done either. *See United States v. Boone*, 951 F.2d 1526, 1535 (9th Cir. 1991). Turner's flat denial to this question necessarily meant that he had neither assisted Breitbach nor been involved with him in the manufacture of methamphetamine. The jury thus could find beyond a reasonable doubt that the answer was intentionally false.

C.

Finally, Turner argues that the district court erred by holding that his methamphetamine manufacturing had posed a substantial risk of harm to human life, thereby increasing his offense level by three levels under USSG § 2D1.1(b)(6)(B) (now § 2D1.1(b)(8)(B)). We review the court's application of this guideline provision *de novo*, and we review its factual findings for clear error. *United States v. New*, 491 F.3d 369, 379 (8th Cir. 2007).

The district court concluded that Turner's methamphetamine manufacturing had posed a substantial risk of harm to human life, largely because the court found that his methamphetamine manufacturing had caused the fire. The court reasoned that the fire posed a substantial risk of harm to the lives of Turner's neighbors and the firefighters who responded to it. Turner contends that this conclusion was erroneous, because the fire department was unable to determine the cause of the fire.

The fire department did determine that the fire had started in Turner's basement in the vicinity of his methamphetamine precursors and manufacturing equipment. The government also presented evidence that these precursors included volatile chemicals, most notably red phosphorous, which can be ignited by "a small amount of friction or any kind of impact or a high temperature," and cannot be extinguished by water

from a hose. (T. Tr. 264-65). Turner admitted to his associate Hoyne, after the fire, that he had experienced trouble with the "red man" (slang for red phosphorous), (*id.* at 168), thus implying that the fire was started by an accident he had with red phosphorous while manufacturing methamphetamine. We conclude that the district court did not clearly err in finding that the fire had been started by Turner's methamphetamine manufacturing. This finding, together with Turner's collection of flammable and improperly stored chemicals and liquids in a residential neighborhood, amply supported the conclusion that Turner's manufacturing posed a substantial risk of harm to human life. *See* USSG § 2D1.1, comment. (n. 20).

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____