RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

　　*v.*

No. 08-6152

BILLIE FAYE ANDERSON,

　　　　　　　*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 07-00048-001—J. Ronnie Greer, District Judge.

Argued: April 29, 2010

Decided and Filed: May 19, 2010

Before: MOORE and GILMAN, Circuit Judges; RUSSELL, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Dan R. Smith, LAW OFFICE, Johnson City, Tennessee, for Appellant. Debra A. Breneman, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Dan R. Smith, LAW OFFICE, Johnson City, Tennessee, for Appellant. Debra A. Breneman, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Billie Anderson was indicted on one count of Medicaid fraud. After the government presented its case in chief, Anderson moved to dismiss the indictment as duplicitous and, alternatively, requested specific jury

_____

[*] The Honorable Thomas B. Russell, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

instructions to cure the alleged duplicity.  The district court denied the motion and refused to charge the jury with the requested instructions.  After the jury found Anderson guilty, the court sentenced her to 24 months of imprisonment.  She then filed a post-trial motion to dismiss the indictment, alleging that it failed to state an offense, but this motion was also denied by the court.  Anderson now appeals the denial of both motions.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

The government's charge revolved around the absence of a medical director at Anderson HealthCare, Inc. (AHC), a long-term healthcare facility located in Gray, Tennessee, between March 2002 and January 2003.  Anderson was accused of fraudulently concealing this absence, thereby allowing AHC to continue receiving Medicaid payments to which it was not entitled.

AHC participated in Medicaid, a state-administered program through which healthcare providers are reimbursed with federal funds for providing certain services to the indigent.  TennCare, a division of the Tennessee Department of Health, is responsible for processing eligible claims for services provided by healthcare facilities in Tennessee and paying reimbursements with a combination of state and federal funds.

A facility's ongoing participation in Medicaid is conditioned on its compliance with various federal, state, and local regulations, 42 C.F.R. § 483.75(b), including the requirement that a long-term healthcare facility "designate a physician to serve as medical director,"  42 C.F.R. § 483.75(i)(1).  A medical director is responsible for coordinating medical care within the facility and implementing resident-care policies. *Id.* § 483.75(i)(2).

At all relevant times, Billie Anderson was an owner and the administrator of AHC.  In these positions, Anderson hired and fired AHC employees, made all of the financial decisions, and was responsible for paying the medical director.

Glenna Taylor, a registered nurse who worked at AHC from 1981 until either 2001 or 2002, testified that for the entire time she was employed there, the facility had a medical director. For the last 10 years of Taylor's employment, Dr. Daniel David served in that position. Dr. David was a faculty member at East Tennessee State University (ETSU), and the ETSU physicians group had a contract with AHC, providing that Dr. David would be the facility's medical director. But on January 15, 2002, ETSU sent a letter to Anderson stating that its physicians group intended to terminate the contract with AHC effective March 15, 2002.

In September 2002, the Tennessee Department of Health conducted its annual survey of AHC. Annual surveys are designed to determine a facility's compliance with federal and state regulations regarding patient care. During the survey, an employee at AHC was given a Disclosure of Ownership and Control Interest Statement Form, which was signed by Anderson and given to the state team by the end of the survey. One of the questions on the form asked: "Has there been a change in Administrator, Director of Nursing or Medical Director within the last year?" The form was checked "No" in response to this question and was dated September 19, 2002. Above the signature line was a bolded statement warning that the making of a false statement on the form could result in prosecution under federal or state laws, and that "knowingly and willfully failing to fully and accurately disclose the information requested may result in denial of a request to participate or[,] where the entity already participates, a termination of its agreement or contract with the state agency or the Secretary [of Health and Human Services]."

AHC's September 2002 survey revealed numerous "immediate jeopardies," meaning that there were serious and immediate threats to the residents' safety and health. The Tennessee Department of Health therefore conducted an extended survey, also in September 2002, to follow-up on the immediate jeopardies. As part of this more detailed survey, the Department prepared a list of items it would need from AHC, including the medical director's license to practice medicine, the medical-director contract, and all other contracts that the facility had in place. The survey team was initially told that the

medical director was Dr. David, but later was told that Dr. Frank Johnson was the medical director. On September 19, 2002, AHC could not produce the medical license for either physician. One day later, however, AHC faxed the survey team a copy of Dr. Johnson's license.

Rebecca Riddle became the office manager at AHC in either December 2001 or January 2002. She recalled overhearing a heated conversation between Anderson and Dr. David in January 2002 about the doctor's resignation. Riddle testified that Anderson thus knew that Dr. David was leaving as the medical director. Sometime later, Riddle typed up a proposed medical-director contract for Dr. Johnson, which she then sent to him. Riddle was aware that Dr. Johnson had turned down the contract because he sent the contract back in the mail unsigned and "with a sticky note on it." She further testified that Anderson did not hire anyone else as medial director after Dr. Johnson turned down the job, and that AHC did not have a medical director during the September 2002 surveys.

Riddle told Anderson during the extended survey that the Tennessee Department of Health wanted to see the medical-director contract. Anderson, according to Riddle, said "[t]hey'll close me down" when Riddle pointed out that the facility did not have a medical director. This prompted Anderson to have Riddle retrieve Dr. Johnson's contract that he had sent back unsigned, to say "[l]et's try this," and to give Riddle the unexecuted contract for the latter to hand the survey team. When a member of the survey team told another AHC staff member that the team needed a signed version, Anderson took the contract back, signed it herself on behalf of AHC, and told Riddle to sign Dr. Johnson's name, which Riddle did. Dr. Johnson had not authorized Riddle to sign for him, and Riddle eventually told state investigators in February of 2003 about this incident.

Following the extended survey, TennCare notified Anderson that, based on the deficiencies found during the surveys, it would recommend that her Medicaid provider agreement be terminated. Because AHC had furnished a medical license and a signed medical-director contract for Dr. Johnson, it was not cited for the absence of a medical

director.   Anderson subsequently submitted a plan of correction, which specifically mentioned the involvement of the medical director in implementing changes.  She was thereafter notified that as of October 25, 2002, AHC was in compliance with the relevant regulations, so its contract would not be terminated.

In response to the extended survey, Anderson hired nursing consultant Debra Verna in late fall or early winter 2002 to help keep AHC in compliance with federal and state regulations.   Verna met Dr. Johnson while working at AHC and said she understood that he was the medical director.  Dr. Johnson immediately stated that he was not the medical director, that Verna needed to inform Anderson of that, and that he had not signed any contract.  When Verna informed Anderson the next day about this conversation, Anderson stated that she did not know why Dr. Johnson would say that, causing Verna to suggest that Anderson follow up with him.  After Verna stopped working at AHC in approximately January 2003, she filed an anonymous complaint with the Tennessee Department of Health regarding the facility's lack of a medical director.

Dr. Robert Chapman Lee entered into a written contract with AHC on January 8, 2003 to become its medical director, and he began his employment on that date. Because "there were things going on that [he] didn't feel comfortable with," however, Dr. Lee sent Anderson a certified letter on February 1, 2003 notifying her that he was resigning as the medical director.

In response to complaints about AHC, the Tennessee Department of Health began an investigation in February 2003 to determine whether there was a medical director at the facility.   The Board of Nursing Home Administrators suspended Anderson's administrator's license in March 2003 because it found that "from on or around March 16, 2002 to on or around January 7, 2003, [Anderson] operated Anderson HealthCare, Inc. without a medical director."  Before this investigation, neither federal nor state officials knew that AHC was without a medical director during the period of time in question.  At trial, the prosecution presented proof that TennCare had paid AHC over $1 million as a result of reimbursement claims filed and signed by Anderson each month from July 2002 through January 2003.

**B.       Procedural history**

Anderson was originally indicted in June 2007 on eight counts of Medicaid fraud. In August 2007, the government moved to dismiss all but one count. The remaining count, brought pursuant to 42 U.S.C. § 1320a-7b(a)(3), read as follows:

> [I]n or about March 2002 until in or about January 2003, in the Eastern District of Tennessee, BILLIE FAYE ANDERSON, having knowledge of an event that affected her continued right to receive payments from a federal health care program, that is, Medicaid, that event being the absence of a medical director at Anderson HealthCare, Inc., as required by law, concealed and failed to disclose that event with the intent fraudulently to secure Medicaid payments when none were authorized, by submitting claims for payments to Medicaid knowing she was not entitled to receive such payments.

Anderson's jury trial began in September 2007 and lasted four days. At the close of the government's proof, Anderson moved to dismiss the indictment as duplicitous, arguing that the government should have brought separate counts for each month during the period that AHC allegedly did not have a medical director, but was still submitting monthly reimbursement claims. She contended that without such a breakout, neither the parties nor the court would be able to tell if the jury unanimously determined when the offense occurred during the relevant months. Anderson thus claimed that her Sixth Amendment right to a unanimous jury verdict would be violated by the incorporation of ten specific offenses into one count. In response, the government argued that it was not charging Anderson with submitting false claims—an offense that could have been committed with each monthly request for reimbursement—but with the continuing failure to disclose the absence of a medical director at AHC.

The district court noted that Anderson's motion to dismiss should have been raised pretrial. It nevertheless proceeded to the merits of the motion by ruling that the indictment was not duplicitous because the filing of monthly reimbursement claims was not an element of the offense. The court thus concluded that the indictment charged a single violation that was continuous in nature.

After the court denied Anderson's motion, she requested the following jury instruction to cure the alleged duplicity of the indictment:

> Before you can find the defendant guilty of the charge in this indictment, you must unanimously agree that the government has proved the following three elements beyond a reasonable doubt, and those are the three elements that the government and the court and the defendant have agreed to, beyond a reasonable doubt for each of the 11 months charged in the indictment; that if there is even one month within the period where the government has failed to carry its burden as to these three elements, then you must acquit the defendant.

Anderson later requested a second instruction regarding the "in or about" language in the indictment:

> The indictment charges that the crime commenced and ended "[i]n or about" various dates. The government does not have to prove that the crime began and ended on any exact date but the government must prove that the crime continued from the starting date that you find until the ending date that you find.

Finally, Anderson sought special findings of fact from the jury regarding the dates for the commencement and termination of the crime. The government objected to each of these proposals, and the district court ultimately refused to include them.

After less than two hours of deliberation, the jury found Anderson guilty. Following several sentencing continuances and an unsuccessful motion for a new trial filed by Anderson, the district court sentenced Anderson in September 2008 to 24 months of imprisonment, three years of supervised release, a $100 assessment, and a $25,000 fine. She subsequently filed a post-trial motion to dismiss the indictment for failure to state an offense pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, which the district court denied. Anderson has timely appealed the district court's denial of her motions to dismiss the indictment as duplicitous and to dismiss the indictment for failure to state an offense.

## II.  ANALYSIS

### A.     Standard of review

We review de novo the sufficiency of an indictment.  *United States v. Ahmed*, 472 F.3d 427, 431 (6th Cir. 2006).  Similarly, we employ de novo review to determine if an indictment is duplicitous.  *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007).  But we review a district court's denial of a requested jury instruction for abuse of discretion.  *United States v. Gray*, 521 F.3d 514, 540 (6th Cir. 2008).  An abuse of discretion will not be found if the jury instructions "as a whole . . . adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision."  *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005).

### B.     Failure to state an offense

Anderson first challenges the district court's denial of her post-trial motion to dismiss the indictment for failure to state an offense.  A party may raise an allegation that the indictment does not state an offense at any time, including post-trial or on appeal.  *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) (allowing a defendant to challenge the sufficiency of the indictment for the first time on appeal). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*,  418 U.S. 87, 117 (1974).

Anderson was charged under 42 U.S.C. § 1320a-7b(a)(3), which provides that

> [w]hoever, . . . having knowledge of the occurrence of any event
> affecting . . . his initial or continued right to any . . . benefit or payment
> [under Medicaid], conceals or fails to disclose such event with an intent
> fraudulently to secure such benefit or payment either in a greater amount
> or quantity than is due or when no such benefit or payment is authorized,
> . . . shall . . . be guilty of a felony.

Anderson's indictment clearly tracked the language of the statute and thus contained the elements of the offense.  Specifically, it charged that (1) Anderson had knowledge of an

event affecting her right to receive Medicaid payments, (2) she concealed the event, and (3) in concealing the event, she acted knowingly and willfully with the intent to fraudulently secure Medicaid payments. *See United States v. Collis*, 128 F.3d 313, 317 (6th Cir. 1997) (holding that an indictment was sufficient because "[t]he charged offense fully tracks the relevant language of" the statute). Given these specific allegations, Anderson was fairly informed of the charge against which she had to defend. This satisfies the first prong of *Hamling*. (We recognize that both the statute and the indictment refer to an *individual*'s right to receive Medicaid payments. Here, the payments went to AHC, not to Anderson individually. But neither party has raised this potential discrepancy, so we decline to address it.)

The indictment also included the relevant time period and the specific event that triggered the charge against her—the absence of a medical director. Anderson would accordingly be able to adequately plead an acquittal or conviction in bar of any future prosecutions arising from the same offense. The second requirement of *Hamling* is thus met. Indeed, Anderson does not dispute that the *Hamling* test is satisfied in the instant case. She instead argues on appeal that the indictment is insufficient because there is allegedly no statute or regulation that would put Anderson on notice that her facility's participation in Medicaid "would automatically disintegrate or immediately terminate with the instance of the loss of the Medical Director."

But this argument misses the point. Anderson is not so much contending that the indictment fails to state an offense, but rather that she could not be guilty under the statute because the absence of a medical director is not an event automatically terminating her facility's right to receive Medicaid payments. This is an issue that Anderson was free to argue at trial; i.e., that one element of the statute was not satisfied because the absence of a medical director purportedly does not affect AHC's right to Medicaid payments under federal and state rules. But the government was also free to include in its indictment the charge that the absence of a medical director *does* affect the continuing right to receive Medicaid payments. The indictment need only set forth elements that, *if proven*, constitute a violation of the relevant statute. *See Hamling*, 418

U.S. at 117 (stating that the indictment may track the language of the statute, provided that the statute itself clearly "set[s] forth all the elements necessary to constitute the [offense] intended to be punished" (citation omitted)).

In any event, the right of a long-term healthcare facility to participate in Medicaid payments is in fact conditioned on the presence of a medical director. *See* 42 C.F.R. § 483.75(b) ("The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes . . . ."); § 483.75(i)(1) ("The facility must designate a physician to serve as medical director."). As the district court correctly noted, if a facility loses its medical director, then this event would affect the facility's right to Medicaid payments because it would no longer be operating in accordance with federal regulations. And Anderson conceded that she was aware that her facility needed a medical director. Her defense at trial, which the jury obviously disbelieved, was that Dr. William Bailey, her personal physician, had agreed to serve as the medical director without compensation.

Moreover, the statute under which Anderson was charged does not require that an individual conceal an event that would *automatically terminate* her facility's Medicaid payments; the concealment of an event that would adversely *affect* the facility's right to continued payments is sufficient to violate the statute. *See* 42 U.S.C. § 1320a-7b(a). In sum, the indictment satisfies both of *Hamling*'s requirements. The district court thus did not err in denying Anderson's post-trial motion to dismiss the indictment for failure to state an offense.

Anderson's appellate brief appears to mix her arguments about the indictment's alleged failure to state an offense with arguments about whether the statute or the indictment violates her right to due process for lack of fair notice. She contends, for example, that the indictment "fails to state an offense for which Mrs. Anderson or a person of ordinary intelligence would have fair notice that the conduct is a crime." And at oral argument, her counsel contended that at most a person in Anderson's position would have known that she would face *civil* penalties for failing to have a medical director, but could not have known that such a failure implicated *criminal* penalties.

"[O]ne of the basic tenets of due process jurisprudence is that citizens be afforded fair notice of precisely what conduct is prohibited." *United States v. Blaszak*, 349 F.3d 881, 885 (6th Cir. 2003). A citizen may be presumed to know the content of the law so long as the relevant statute is not "so technical or obscure that it threatens to ensnare individuals engaged in apparently innocent conduct." *United States v. Baker*, 197 F.3d 211, 219 (6th Cir. 1999).

We conclude that 42 U.S.C. § 1320a-7b(a) is not so technical or obscure that an individual in the long-term healthcare business would be oblivious to its prohibitions and criminal penalties, particularly because the statute requires the individual to act *with the intent* to fraudulently secure payments. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (noting that "the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed"). The fact that the government was required to establish that Anderson acted "with an intent fraudulently to secure" Medicaid payments significantly weakens any argument that the statute "threatens to ensnare individuals engaged in apparently innocent conduct." *See Baker*, 197 F.3d at 219.

Moreover, even if the statute were considered highly technical and did not have a scienter requirement, someone in Anderson's position would be hard-pressed to claim that she was not on notice that she was subject to stringent and complex federal and state regulations. In *Baker*, for example, this court held that the defendant did not lack fair notice of a statute that prohibited possession of a firearm by a person subject to a domestic-protection order that explicitly stated in bold letters that the defendant could not lawfully possess a firearm. *Id.* at 219-20. The court reasoned that the fact that the defendant "had been made subject to a domestic violence protection order provided him with notice that his conduct was subject to increased government scrutiny." *Id*. This led the court to observe that it was "not reasonable for someone in his position to expect to possess dangerous weapons free from extensive regulation." *Id*. Analogous to the defendant in *Baker*, Anderson could not reasonably expect to operate a long-term

healthcare facility that receives large amounts of federal and state money without being closely regulated. Equally important, the annual survey form that Anderson signed in September 2002 specifically stated, in bold type above her signature, that a false statement could result in prosecution under federal or state laws.

The fact that the statute does not specifically enumerate the events that could affect a healthcare facility's right to continue receiving Medicaid payments does not change this conclusion. Although the average citizen would not know what events affect this right, we can impute particularized knowledge to those affected by the statute where the statute regulates "a particular industry or subgroup" and not the public at large. *See United States v. Caseer*, 399 F.3d 828, 837-38 (6th Cir. 2005) (recognizing this principle, but contrasting the situation where the statute regulated the public at large, and concluding that "the term 'cathinone' is sufficiently obscure that persons of ordinary intelligence . . . probably would not discern that possession of [a stimulant] containing cathinone . . . constitutes possession of a controlled substance"). Anderson can therefore be held to have notice of the events that would affect a healthcare facility's right to continue receiving Medicaid payments as part of the industry regulated by various healthcare statutes and accompanying regulations.

At oral argument, Anderson's counsel contended that because federal regulations separately list the positions for which a long-term healthcare facility must notify the state of any changes (which do not include the medical director), *see* 42 C.F.R. § 483.75(p)(2), an individual would not be on notice that she needed to notify the state of the absence of a medical director. This argument again misses the point. The statute criminalizes the concealment of an event that affects a facility's right to Medicaid payments. And the regulations set out the requirements for participation in Medicaid—in effect, the people and processes that must be in place for a facility to be eligible for Medicaid funds. There is no need for a specific regulation requiring the disclosure of a change in the medical director because the prohibition on concealing or failing to disclose an event affecting the right to Medicaid payments comes from the *statute* itself. Thus, to the extent that Anderson argues that 42 U.S.C. § 1320a-7b(a)

violates due process by failing to give fair notice of what it prohibits, her argument is without merit.

## C.      Duplicity

Anderson also appeals the district court's denial of her mid-trial motion to dismiss the indictment as duplicitous and her proposed jury instructions to cure the alleged duplicity.  As a general rule, a defendant must move to dismiss an allegedly duplicitous indictment before the trial begins.  *United States v. Adesida*, 129 F.3d 846, 849 (6th Cir 1997).  Where, however, the alleged error "concerns not only a technicality (two offenses are charged in one count), but also raises issues involving substantive rights (right to a unanimous jury verdict)," it may be raised mid-trial or on appeal for the first time.  *Id*.  Anderson alleges that the indictment not only charged multiple offenses within one count, but also violated her right to a unanimous jury verdict under the Sixth Amendment because the jury might not have been unanimous as to Anderson's alleged intent to defraud with regard to each monthly statement sent out by AHC during the period in question.  Thus, her failure to raise duplicity as an issue before her trial began does not bar our review of this claim.

"A duplicitous indictment charges separate offenses within a single count. The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997) (citations and internal quotation marks omitted).   Anderson claims that her indictment was duplicitous because "it was impossible to tell from the Indictment if Mrs. Anderson was charged and convicted of a continuing offense that continued during the entire time frame charged in the Indictment or if she was charged and convicted of one or more single offenses of submitting unauthorized claims at some point or points within the time frame."  The government responds by contending that the indictment "charges a single offense: concealing and failing to disclose an event that affected the facility's eligibility to continue to receive Medicaid payments."

Anderson's argument is without merit.  The government did not contend that the information provided in AHC's monthly statements was false—i.e., that AHC did not actually provide the services stated or that AHC sought too much in reimbursement expenses.  Even if the claims themselves were truthful on their face, Anderson was still violating 42 U.S.C. § 1320a-7b(a) because AHC was not entitled to *any* payments during the period of time that it lacked a medical director.  The evidence regarding Anderson's submission of claims for Medicaid reimbursements was simply part of the government's proof of her intent to fraudulently secure Medicaid payments during the period of time that she was concealing the absence of a medical director at AHC.

In sum, the indictment alleges an offense that was continuous in nature—from March 2002 until January 2003—during which time Anderson concealed the absence of a medical director.  The continuous nature of the scheme prevents the indictment from being duplicitous.  At oral argument, Anderson's counsel contended that there was evidence that, during some of those months, AHC did have a medical director, so the jury could not have unanimously found that she was guilty for the entire period charged in the indictment.  Such a contention, however, is a challenge to the sufficiency of the evidence, not to the nature of the indictment.  Because of our conclusion that the indictment is not duplicitous, the district court properly acted within its discretion by denying the jury instructions that Anderson requested to cure the alleged duplicity.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.